IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| RALPH DEWSNUP,<br><br>     Plaintiff,<br><br>vs.<br><br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>     Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:17-cv-00126-TC |

  Ralph Dewsnup, a trial attorney with the law firm Dewsnup King & Olsen, underwent quadruple bypass heart surgery after suffering a heart attack. As he recovered, he received long-term disability benefits under a plan offered by his firm and insured by Defendant Unum Life Insurance Company of America (Unum).

  The surgery repaired Mr. Dewsnup's heart, but left him with constant pain across his chest that would worsen with stress. Nonetheless, after providing disability benefits for ten months, Unum determined that Mr. Dewsnup was healthy enough to return to work and that his pain—the remaining consequence of his surgery—was not disabling. Unum terminated his disability benefits, a decision Mr. Dewsnup now challenges under the Employment Retirement

Income Security Act of 1974 (ERISA). For the reasons set forth below, the court reverses Unum's decision.

## BACKGROUND FACTS

### Unum's Long Term Disability Income Plan

Mr. Dewsnup's law firm allows its eligible employees to participate in a Long Term Disability Income Plan ("the Plan") insured by Defendant Unum. Should a participant become disabled, the Plan provides that Unum will pay the participant 60% "of basic monthly earnings not to exceed the maximum monthly benefit [of $15,000], less other income benefits." (R. at UA-POL-000003, ECF No. 36.)[1] The duration of the benefits depends on the claimant's age at disability. Mr. Dewsnup was 67 years old when he suffered his heart attack, and so qualified for a maximum of eighteen months of benefits.

For attorney participants, the Plan defines "disability" as follows:

"Disability" and "disabled" mean that because of injury or sickness:

1. the insured cannot perform each of the material duties of his regular occupation; or

2. the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:

   a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

   b. earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

---

[1] The parties filed a sealed pre-litigation ERISA record composed of two parts: Mr. Dewsnup's claim file, identified by the Bates prefix "UA-CL," and the Plan documents, with the prefix "UA-POL."

(R. at UA-POL-000010.)  The definition includes a note that "[f]or attorneys, 'regular occupation' means the specialty in the practice of law which the insured was practicing just prior to the date disability started."  (Id.)

**Mr. Dewsnup's Claim for Benefits**

Mr. Dewsnup suffered a heart attack on March 18, 2015, and underwent quadruple bypass heart surgery the next day.  The procedure was successful, but not without complication.  Soon after surgery, Mr. Dewsnup began experiencing pain around the site of his incision.

Mr. Dewsnup reported his pain to his treating physicians.  In notes from an April 9, 2015 follow-up appointment, his heart surgeon, Dr. J. Kent Thorne, stated that Mr. Dewsnup was "doing well but notes that he has had some general skin discomfort, 'feels like his skin has been burned with a torch.'  This sensation is in his left chest and [lower left extremity]."  (R. at UA-CL-000316.)   At an April 20, 2015 appointment with his cardiologist, Dr. Scott Hacking, Mr. Dewsnup again complained of a burning sensation on his chest wall.  Dr. Hacking diagnosed Mr. Dewsnup as suffering from neuropathic pain—pain caused by nerve damage that occurred during surgery but otherwise unrelated to his heart.  His doctors prescribed a pain-relieving patch, then a topical pain-relieving gel to apply to the site of his incision.

Mr. Dewsnup's heart continued to heal, but his pain persisted through the summer and fall of 2015.  Dr. Hacking prescribed Gabapentin, a medication for nerve pain.  He also referred Mr. Dewsnup to Dr. Kendall Grose, a pain specialist.

Mr. Dewsnup met with Dr. Grose on October 22, 2015.  Dr. Grose diagnosed his pain as intercostal neuralgia likely caused by "nerve entrapment or injury of the intercostal nerve."  (R. at UA-CL-000357.)  He noted that Mr. Dewsnup "has had extensive chest wall intervention that

potentially could have irritated, compressed, or severed these nerves, contributing to the severity of his symptoms." (Id.)

Dr. Grose recommended that Mr. Dewsnup undergo an intercostal nerve block—an injection of medication into the nerve itself. He also recommended that if the procedure was successful, "we can consider pulsed radiofrequency ablation of the same nerves at the same level." (Id.)

Mr. Dewsnup underwent a nerve block, but the procedure did not significantly reduce his pain. He elected not to undergo a nerve ablation.

On September 24, 2015, Mr. Dewsnup applied to Unum for long term disability benefits. By this time, he had begun to work part time at the law firm, but reported that the stress of work would exacerbate his chest pain, and the pain hindered his concentration and caused fatigue. Mr. Dewsnup worked intermittently—ten to ten to fifteen hours on some weeks, and not at all on others. While he would interact with clients, his colleagues at the firm would handle other aspects of his cases.

On November 9, 2015, Unum approved benefits, finding that Mr. Dewsnup was "unable to perform the material and substantial duties of [his] regular occupation due to [his] medical conditions of recovery from quadruple coronary artery bypass graft, ongoing post-operative pleural effusion, and neuropathic chest wall pain." (R. at UA-CL-000294.)

**Unum's Termination of Benefits**

After approving Mr. Dewsnup's benefits, Unum continued to monitor his recovery. On January 13, 2016, a Unum representative spoke with Mr. Dewsnup by telephone to discuss his progress. According to Unum's notes from the call, Mr. Dewsnup "said that he is having

superficial chest pain at the skin surface of his whole chest and it ends up creating fatigue. This chest pain is exacerbated by vigorous movements/exercise and stress and is worse at night than it is in the morning." (R. at UA-CL-000462.) Mr. Dewsnup also reported that his chest pain prevented him from doing much of his past work as an attorney, such as "prepar[ing] for trial, taking depositions, being up to midnight, and dealing [with] adversaries . . . ." (Id.)

Despite his continued pain, Mr. Dewsnup reported that he had stopped taking Gabapentin because it was making him feel strange. And he had refused other pain medications, fearing similar side effects. Rather than seek additional treatment, he had decided to wait out the pain, which he understood could take between five months and two-and-a-half years to resolve.

On February 5, 2016, Unum sent a letter to Dr. Hacking inquiring onto Mr. Dewsnup's condition. The letter asked whether Mr. Dewsnup could perform the following occupational demands for a trial attorney:

**Physical Demands:**

- Constant: talking, hearing
- Frequent: reaching, handling, fingering
- Sitting most of the time but may involve brief periods of standing or walking.
- Strength: Exerting up to 10 pounds of force occasionally, and/or a negligible amount of force frequently to lift, carry push, pull, or otherwise move objects.

**Cognitive Demands:**

- Memory
- Concentration and attention
- Influencing people in their opinions, attitudes, and judgments.
- Performing a variety of duties.
- Dealing with People.
- Making judgments and decisions.

(R. at UA-CL-000486.)

In the letter, Unum posed the question, "Is Ralph Dewsnup able to perform the above occupational demands on a full-time basis at this time?" (R. at UA-CL-000487.) Dr. Hacking replied, "no." (Id.) As an explanation, Dr. Hacking wrote that "Ralph has had persistent chest pain since his [coronary artery bypass grafting] procedure. This has limited his ability to [illegible] his job." (Id.) The letter also asked when Dr. Hacking expected Mr. Dewsnup could perform the occupational demands on a full-time basis. Dr. Hacking replied, "never." (Id.)

On April 12, 2016, a Unum representative called Mr. Dewsnup for another update. According to Unum's notes from the call, Mr. Dewsnup remained in pain. Mr. Dewsnup reported

> that his chest pain is like a bib in size. He has pain across his entire chest wall which goes into his skin and below the surface but not down into his chest cavity. The pain goes across his chest from armpit to armpit and down his sternum. He doesn't feel like it is his heart. By the end of the day, it is a burning sensation. [He] said that it hurts when clothing rubs on it and it hurts more with stress. By the end of the day the pain is fatiguing. [He] started taking Ambien at night to sleep and if he doesn't take that then pain will keep him awake most of the night. [He] doesn't like wearing a seat belt b/c it doesn't feel good but he wears it so he doesn't get a ticket. [He] said that the pain is always there and intensity varies.

(R. at UA-CL-000546.)

Despite the pain, Mr. Dewsnup reported increased activity at home. Mr. Dewsnup told the representative that he had recently finished carving a wooden mantle for his house, and that he would help his wife with housework such as laundry, dishes, and vacuuming. He also reported that he would walk on a treadmill four to five days a week, for thirty minutes at a time.

After the call, Unum requested four separate reviews of Mr. Dewsnup's medical file to determine whether Mr. Dewsnup remained disabled under the Plan. Unum provided each reviewer with an occupational description, or "occupational ID," prepared by Unum's vocational consultant. The occupational ID contained the same list of physical and cognitive demands Unum had sent to Dr. Hacking. It also summarized the "Material and Substantial Duties" of a "Litigation Attorney," Mr. Dewsnup's occupation as defined by a vocational handbook:

> Performs consultation, advisory, arbitration, and trial work, and carries out the legal processes necessary to affect the rights, privileges, and obligations of the client.
>
> Works directly with and represents plaintiffs or defendants to bring or pursue a lawsuit to be tried in a court of justice for the purpose of enforcing a right when settlement negotiation and arbitration efforts fail.
>
> Conducts criminal and civil lawsuits, draws up legal documents, and advises clients as to legal rights.
>
> Gathers evidence, conducts research, interviews clients and witnesses, prepares legal briefs, and develops strategy, arguments, and testimony in divorce, civil, criminal, and other cases to formulate an offense or defense or to initiate legal action.
>
> Examines legal data to determine advisability of defending or prosecuting lawsuit.
>
> Files briefs with court clerk.
>
> Represents client in court and before quasi-judicial or administrative agencies of government.
>
> Studies the Constitution, statutes, decisions, and ordinances of quasi-judicial bodies.
>
> Interprets laws, rulings, and regulations for individuals and businesses.

(R. at UA-CL-000470–71.)  The occupational ID also noted that litigation attorneys may face stressful deadlines and work more than forty hours a week.  (R. at UA-CL-000472.)

Helen DiCesare, a registered nurse, conducted the first review.  She concluded that "the medical records do not support that [Mr. Dewsnup] would be unable to perform his own occupation on a full time basis."  (R. at UA-CL-000554.)  According to Ms. DiCesare,

> records to date show no evidence of memory deficits, concentration concerns or lack of judgment.  [Mr. Dewsnup] reported that when he tried Gabapentin that it caused cognitive and memory issues and he chose to discontinue using the medication to avoid these side effects.  [Mr. Dewsnup] reports that the ongoing pain causes fatigue, however, [he] reports using Ambien for sleep and reports getting 6-7 hours sleep/night.  Dr. Hacking notes pain and fatigue are exacerbated by stress, however there is no correlating evidence that this is ongoing . . . .  A review of the records do not appear to preclude [him] from performing the cognitive demands of his occupation on a full time basis.

(Id.)

Ms. DiCesare also questioned the veracity of Mr. Dewsnup's self-reported pain:

> [Mr. Dewsnup] is still able to perform [activities of daily living], housework, wood carving, and getting to the office and performing [part-time] occupational demands. . . .  Despite [his] ongoing complaints of pain, he has opted to "wait it out" and has declined further treatment options or medications . . . .  There is evidence to support that [Mr. Dewsnup] has improved over time and has demonstrated an increased tolerance for activity enabling him to have the ability to perform the physical demands of his occupation on a full time basis. [His] reported symptoms appear to be exaggerated and ongoing, despite documented increase in activity and ability and a decrease in complaint of pain.

(Id.)

Dr. James Haller, a physician certified in family medicine, conducted the second review.  As part of his review, Dr. Haller spoke with Dr. Hacking on the telephone.  According to Dr.

Haller, Dr. Hacking told him that Mr. Dewsnup did not have physical limitations "other than what's comfortable," and that his work limitations "are based on reports from the patient that the pain makes it difficult to focus on his work." (R. at UA-CL-000567.)

Like Ms. DiCesare, Dr. Haller concluded that Mr. Dewsnup's medical records did not support a finding of disability:

> [A]lthough the patient continues to express symptoms of chest pain and fatigue, the weight of evidence as demonstrated by improved activities, physical exam findings, testing, and a lack of intensity of management regarding these symptoms fails to support that the claimant is limited from performing his reported occupational duties as referenced in the occupational ID.

(R. at UA-CL-000574.)

Dr. George DiDonna, a cardiologist, conducted a third review of Mr. Dewsnup's file. He wrote that "[f]rom a cardiac perspective there are no restrictions or limitations that would preclude him from the activities in which he was involved prior to [surgery] inclusive of his occupational activities." (R. at UA-CL-000578.) But Dr. DiDonna was "uncertain whether the chronic burning type chest pain rises to the level of impairment and precludes the insured from returning to his prior activities including his prior occupational duties." (Id.)

Dr. Alan Neuren, a neurologist and psychologist, conducted a fourth and final review. Like Ms. DiCesare and Dr. Haller, he concluded that Mr. Dewsnup's medical file did not support a finding of disability:

> No specific cause for the pain has been found. [Mr. Dewsnup] initially stated the symptoms were severe enough to preclude him from wearing a seatbelt. Communication in October indicates insured is able to use a seatbelt. He also engages in other activities as noted above. The contention that the stress of work aggravates

his symptoms is speculative, given that the insured has not worked
since having the surgery.

Insured's reported activities would indicate symptoms are not severe
enough that they would preclude him from functioning in his usual
capacity.

(R. at UA-CL-000583.)

On April 28, 2016, following its reviews, Unum sent Mr. Dewsnup a letter denying

further disability benefits.  Unum's reasoning in the letter mirrored that of the reviewers: Mr.

Dewsnup did seem to be improving.  He could wear a seatbelt, use a treadmill for short

workouts, help his wife with housework, and had carved a wooden mantle.  He had also stopped

treating his pain actively—he had refused to take certain pain medications and declined to

undergo a nerve ablation.  And diagnostic testing had "not identified any cardiac or pulmonary

source for [his] chest pain or fatigue."  (R. at UA-CL-000596.)  "Overall," Unum concluded,

> although you continue to report symptoms of chest pain and fatigue,
> the weight of the information in your claim file as demonstrated by
> your improved activities, physical exam findings, testing, and a lack
> of intensity of management regarding your symptoms fail to support
> that you are limited from performing the material and substantial
> duties of your regular occupation as of April 12, 2016.

(Id.)

**Internal Appeal**

On September 7, 2016, Mr. Dewsnup appealed Unum's denial of benefits.  In his appeal

letter, Mr. Dewsnup contested Unum's use of "generalized" attorney duties to judge disability.

(R. at UA-CL-000653.)  He also explained his bases for declining pain treatment.  Medications

caused side effects such as memory loss and confusion, and their own health risks, and the nerve

block procedure did not work. His chest pain, he wrote, "has persisted, essentially unabated, for the last 17 months." (Id.)

Mr. Dewsnup attached three letters to his appeal. The first, from Ed Havas, the president of Dewsnup King & Olsen, took issue with Unum's use of the general physical and cognitive demands of a trial attorney to determine disability. He described Mr. Dewsnup's expertise in handling complex medical malpractice and products liability cases, and the demands of doing so—the fact finding, discovery, motion practice, and trial work, all of which required concentration and long hours and "produce[d] uncommon stresses." (R. at UA-CL-000667.)

Mr. Dewsnup also attached letters from Dr. Hacking and Dr. Thorne. Dr. Hacking's letter, dated June 9, 2016, recounted his conversation with a Unum reviewing physician (presumably Dr. Haller):

> I informed the physician that you had constant nerve pain which covered [your] entire chest wall. I also explained that pain is a subjective symptom and that constant pain can be quite debilitating. I assured him that all efforts had been made to ensure that the pain was not from cardiopulmonary cause and that subjective chest wall pain can be common after an invasive procedure such as cardiopulmonary bypass surgery. . . . Unfortunately, the physician seemed fixated on my cardiopulmonary work up and was set on ignoring and disregarding the pain you have been left with as a result of your heart surgery. . . .
>
> . . . Unfortunately, I have personally had other patients and have reviewed cases such as yours where persistent nerve pain can persist post-operatively and can be exacerbated by stress and movement which can intensify to excruciating levels. This unrelenting pain can certainly interfere with one's quality of life with fatigue, distraction, depression, and certainly could alter thought processes interrupting concentration. . . .
>
> You have mentioned many of your job requirements as a trial attorney. The stress seems to exacerbate your pain symptoms. I do not think that you should continue to do these activities. Dealing

with the constant pressures of court-imposed deadlines, researching and writing documents in an adversarial setting, being involved in stressful and potentially lengthy court proceedings, participating in examination and interrogation of witnesses, arguing motions, and responding to the persistent demands of clients on a daily basis could be well-nigh impossible for you and, in my opinion, would potentially further compromise your health.

(R. at UA-CL-000670–671.)

Dr. Thorne, in his letter dated September 1, 2016, agreed with Dr. Hacking. He opined

that your chest wall discomfort has nothing to do with your heart. It is a chest wall problem and it is related to a neuropathy of the chest wall that was created at the time of your emergency surgery. I am also under the opinion that because of the discomfort from this paresthesia that your occupation as a trial lawyer cannot be pursued to the extent that is needed. I would be agreeable with Dr. Scott Hacking's assessment that this ongoing disability prevents you from work and that there are no medications that will remedy this situation.

(R. at UA-CL-000672.)

Dr. Scott Norris, a physician certified in family and occupational medicine, reviewed Mr. Dewsnup's appeal. He concluded that Mr. Dewsnup was no longer disabled for three main reasons. First, the intensity of Mr. Dewsnup's pain treatment had "reduced to include minimal ongoing treatment . . . ." (R. at UA-CL-000688.) Second, examinations and diagnostic tests did not support a finding of disability. In particular, treadmill testing indicated adequate aerobic function for light to medium physical work, his cardiac health had improved, and he had not reported tenderness to light touch at a number of visits with his treating physicians. Moreover, diagnostic tests and imaging "did not identify cardiac, pulmonary, musculoskeletal or other structural pathology" for his chest pain. (R. at UA-CL-000689.) Third, Mr. Dewsnup's daily activities were consistent with the sedentary physical demands of a trial attorney.

On October 26, 2016, Unum denied Mr. Dewsnup's appeal, concluding in its decision letter that Mr. Dewsnup was "able to perform the duties of [his] regular occupation" and was no longer disabled under the terms of the Plan. (R. at UA-CL-000712.)

## DISCUSSION

Having exhausted the appeal process with Unum, Mr. Dewsnup filed suit in this court under ERISA's judicial review provision, 29 U.S.C. § 1132(a)(1)(B). Mr. Dewsnup and Unum have both moved for summary judgment. Mr. Dewsnup contends that Unum ignored his subjective reports of pain and the opinions of his treating physicians. He also contends that Unum should have judged disability with reference to his specific duties as a trial attorney at Dewsnup King & Olsen, rather than the generalized list of duties for trial attorneys in the national economy. For its part, Unum contends that the objective evidence in the record contradicts and outweighs Mr. Dewsnup's subjective reports of pain.

The court reverses Unum's decision to terminate benefits. Reviewing the record de novo, the court finds that Mr. Dewsnup's claim of disability is supported by a preponderance of the evidence in the record.

## I.   The Court Reviews Mr. Dewsnup's Claim De Novo.

In an ERISA case, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotation omitted). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Both parties agree that the Plan does not give Unum discretionary authority that would negate de novo review.

Under the de novo standard, the court's task "is to determine whether the administrator made a correct decision." Niles v. Am. Airlines, Inc., 269 F. App'x 827, 832 (10th Cir. 2008) (quoting Hoover v. Provident Life and Accident Ins. Co., 290 F.3d 801, 808–09 (6th Cir.2002)). Unum's decision to terminate benefits is not afforded deference or a presumption of correctness. Id. at 832. Instead, the court must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy." Richards v. Hewlett-Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010). To prevail, a claimant's entitlement to benefits must be supported by a preponderance of the evidence based on the court's review of the record. Niles, 269 F. App'x at 833.

## II. Mr. Dewsnup's Claim of Disability is Supported by a Preponderance of the Evidence in the Record.

Mr. Dewsnup, as the claimant, carries the burden of demonstrating disability. Under the terms of the Plan, "disability" means that "the insured cannot perform each of the material job duties of his regular occupation." (R. at UA-POL-000010.) The court will evaluate Mr. Dewsnup's claim using the "material and substantial duties" of a trial attorney in the national economy as described in the Unum's occupational ID, (see R. at UA-CL-000470–71), which can require long hours and entail high cognitive demands—"memory, concentration and attention,

14

influencing people in their opinions, attitudes, judgments, performing a variety of duties, dealing with people, and making judgments and decisions."[2] (R. at UA-CL-000713.)

Neuropathic pain, like other medical conditions with subjective symptoms, "presents a conundrum for insurers and courts evaluating disability claims." Welch v. Unum Life Ins. Co. Of Am., 382 F.3d 1078, 1087 (10th Cir. 2004) (quoting Walker v. Am. Home Shield Long Term Disability Plan, 180 F.3d 1065, 1067 (9th Cir.1999)). Unlike many other injuries or diseases, "the claimant's subjective, uncorroborated complaints of pain constitute the only evidence of the ailment's severity." Meraou v. Williams Co. Long Term Disability Plan, 221 F. App'x 696, 705 (10th Cir. 2007). While subjective evidence can support a claim of disability, Ray v. Unum Life Ins. Co. of Am., 224 F. App'x 772, 786–87 (10th Cir. 2007), "[t]he medical inquiry is . . . intertwined with questions of the claimant's credibility . . . ." Meraou, 221 F. App'x at 705.

The court finds Mr. Dewsnup's reports of pain to be credible for a number of reasons. First, his pain had a straightforward etiology: Mr. Dewsnup underwent open heart surgery, and the surgery damaged nerves on his chest wall. As Dr. Grose, his pain specialist, explained, the surgery was an "extensive chest wall intervention that potentially could have irritated, compressed, or severed" the nerves at the site of the incision. (R. at UA-CL-000357.)

Moreover, Mr. Dewsnup consistently reported the same type and severity of pain throughout the record—a burning sensation across his chest that would worsen with stress. And, when speaking with Unum about his pain, he forthrightly discussed the daily activities he could

---

[2] The parties dispute which job duties Unum should have referenced to determine disability— these somewhat generalized duties, or Mr. Dewsnup's specific job duties at Dewsnup King & Olsen. According to Mr. Dewsnup, Unum's occupational ID does not capture the breadth or intensity of his actual work. The court need not conclusively resolve this question. Even using Unum's occupational ID, Mr. Dewsnup has carried his burden of proving disability.

perform, such as household chores, woodcarving, and part-time legal work. Nothing in the record indicates that Mr. Dewsnup exaggerated his symptoms or misled Unum about what he could or could not do.

Mr. Dewsnup's claim of disability was also corroborated by his treating physicians. Dr. Hacking, Dr. Thorne, and Dr. Grose all examined Mr. Dewsnup and diagnosed him as suffering from neuropathic pain resulting from surgery. Dr. Hacking and Dr. Thorne both opined that the pain was disabling. Dr. Hacking had seen other patients with such post-operative pain, and noted that the pain could "certainly interfere with one's quality of life with fatigue, distraction, depression, and certainly could alter thought processes interrupting concentration." (R. at UA-CL-000671.)

According to Unum, certain evidence in the record contradicts Mr. Dewsnup's self-reported pain: diagnostic tests confirmed his physical ability to work and did not corroborate his pain, his activity level was increasing, and he had discontinued or refused medication and procedures to treat his pain. Unum also notes that all five of its reviewers opined that Mr. Dewsnup was no longer disabled. But none of Unum's reasons undermine Mr. Dewsnup's credibility or speak to his ability to perform the material job duties of a trial attorney.

A. Diagnostic Testing

Unum argues that diagnostic testing supports its decision to terminate benefits for two reasons: testing indicated that Mr. Dewsnup had recovered from a cardiac standpoint, and testing did not support his reports of disabling pain. But the court does not find the results of diagnostic testing (or lack thereof) to be probative of disability.

First, the diagnostic testing that Mr. Dewsnup did undergo had little, if any, relevance to neuropathic pain. For instance, in its April 28, 2018, denial letter, Unum cites to the results of a stress echocardiogram and pulmonary angiogram for the proposition that the tests have "not identified any cardiac or pulmonary source" for Mr. Dewsnup's chest pain. (R. at UA-CL-000596.) But Mr. Dewsnup was undisputedly suffering from chest pain as a consequence of nerve damage, not heart or lung problems. Such tests had no bearing on his disabling condition.

Second, the absence of diagnostic verification of pain does not cut against Mr. Dewsnup's claim, because such an absence is a natural consequence of his condition. The District of Colorado's decision in Lamont v. Connecticut General Life Insurance Co., 215 F. Supp. 3d 1070 (D. Colo. 2016) is instructive. In that case, a plan administrator terminated disability benefits of a claimant suffering from fibromyalgia and chronic fatigue syndrome because of the lack of objective diagnostic support for her claim. The court reversed the administrator's decision. Fibromyalgia and chronic fatigue syndrome were "diagnoses based on subjectively reported symptoms that cannot be backed up with objective diagnostic testing." Id. at 1081. Thus, the court held, "lack of diagnostic confirmation [was] irrelevant to [the claimant's] credibility." Id.

The same is true here. Like fibromyalgia and chronic fatigue syndrome, neuropathic pain lacks testable, objective indicia. The absence of objective diagnostic findings does not bear on Mr. Dewsnup's subjective reports of pain. As the Tenth Circuit has cautioned, "[m]edicine is, at best, an inexact science, and we should not disregard the great weight of the evidence merely because objective laboratory diagnostic findings either are not yet within the state of the art, or

are inconclusive." <u>Gaylor v. John Hancock Mut. Life Ins. Co.</u>, 112 F.3d 460, 467 (10th Cir. 1997).

B.  <u>Increased Daily Activities</u>

Unum also argues that Mr. Dewsnup's increased daily activities supported its decision. Mr. Dewsnup had, for example, carved a wooden mantle, regularly exercised on a treadmill for thirty minutes a day, and helped his wife with housework and chores. He had also returned to work on a part-time basis, in a limited role.

These daily activities, however, do not correlate to all of the material duties of a trial attorney. They might match the relatively sedentary physical demands of a legal work, but none carry the same cognitive demands. None require sustained concentration and focus, advocacy, or long hours, and none can fairly be said to cause the stress of even routine litigation.

Moreover, Mr. Dewsnup never claimed that his pain was completely disabling in every facet of his life. Rather, he reported a constant burning pain that would worsen with stress, cause fatigue, and impair his concentration. It is probable that his pain would prevent him completing the mentally-taxing work of trial attorney, but not prevent him from accomplishing relatively simple and low-stress daily tasks.

C.  <u>Decisions to Forego Treatment</u>

Unum's reliance on Mr. Dewsnup's treatment history is similarly problematic. Mr. Dewsnup's decisions to forgo medication and treatment do not necessarily undermine his credibility or show that his pain was no longer disabling.

Soon after surgery, Mr. Dewsnup actively treated his pain. He used a variety of gels, patches, and medications, consulted with a pain specialist, and underwent a nerve block

procedure.  He declined further treatment and stopped taking certain medications, but not without reason.  Medication caused side effects such as memory loss, hallucinations, and confusion.  Ibuprofen, a common over-the-counter pain medication, could increase his risk of heart disease.  And Mr. Dewsnup declined to undergo a nerve ablation because its efficacy depended on the success of the nerve block that hadn't worked.

The record shows that Mr. Dewsnup declined further treatment in spite of his pain, not because it had resolved.  Certainly, his treatment decisions suggest that his pain was generally tolerable.  But his pain still could have been disabling—severe enough to cause fatigue, hinder concentration, and prevent him from performing the mentally-demanding duties of a trial attorney.  His treatment history does not weigh conclusively against his claim of disability.

D.  The Opinions of Unum Reviewers

Unum argues that the opinions of its reviewers—a nurse and four physicians—undermine Mr. Dewsnup's claim of disability.  All five reviewers determined that Mr. Dewsnup was healthy enough to return to work, and discounted his reports of pain for the reasons discussed above.  Their opinions directly contradict those of Mr. Dewsnup's treating physicians.

In weighing the competing medical opinions in the record, the court is mindful that the opinions of treating physicians are not entitled to special weight in ERISA cases.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  But they may not be ignored, especially when treating physicians—in contrast to reviewers evaluating a medical file—have "a greater opportunity to know and observe the patient as an individual."  Id. at 832 (internal quotation omitted).

In this case, in which Mr. Dewsnup's claim depended largely on his credibility, the court gives greater weight to the opinions of his treating physicians, who were better able to assess the veracity of Mr. Dewsnup's reports of pain. None of Unum's reviewers examined Mr. Dewsnup in person. Apart from phone calls, Unum reviewers simply parsed Mr. Dewsnup's file and compiled what they believed to be contradictory evidence.[3]

Unum was by no means obliged to rubber-stamp Mr. Dewsnup's claim. But under ERISA, a claim administrator "has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim." Rasenack, 585 F.3d at 1324. Unum reviewers would have been well-served to meet with Mr. Dewsnup in person or request an independent medical examination. In the absence of an independent examination, the court will defer to the opinions of Mr. Dewsnup's treating physicians, who conducted face-to-face evaluations and were best able to judge credibility.

In sum, evidence in the record creates, at best, an inference that Mr. Dewsnup was improving and could handle the low physical demands of litigation. But evidence does not clearly support Unum's finding that his pain was no longer disabling, especially considering the long hours, stress, and cognitive demands of litigation. Nor does the evidence undermine the credibility of Mr. Dewsnup's subjective reports of pain. The court finds that Mr. Dewsnup has

_____

[3] The way in which Unum's reviewers evaluated Mr. Dewsnup's claim is itself troubling. Under ERISA and its regulations, "[t]he claim process is not designed to be adversarial." Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1325 (10th Cir. 2009). Unum may not "cherry-pick[] the information helpful to its decision to deny [a] claim and disregard[] the contrary opinions of the medical professionals who examined, treated, and interviewed" Mr. Dewsnup. Id. at 1326.

met his burden of showing disability by a preponderance of the evidence and reverses Unum's decision to terminate his benefits.

### III.   The Court Will Award Past Benefits and Pre-Judgment Interest but not Attorney Fees.

Having determined that Mr. Dewsnup is entitled to benefits, the court "may either remand the case to the plan administrator for a renewed evaluation of the claimant's case or . . . may order an award of benefits." Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1194 (10th Cir. 2007), abrogated on other grounds by Metro Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). "If the plan administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision, then the proper remedy is to remand the case for further findings or additional explanation." Id. But "if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate." Id. As explained above, the preponderance of the evidence supports Mr. Dewsnup's claim of disability. Accordingly, the court will award him benefits rather than remand the case. Unum paid Mr. Dewsnup's benefits from June 26, 2015 to April 28, 2016, a period of approximately ten months. Mr. Dewsnup was entitled to eight additional months of benefits.

In addition to his disability benefits, Mr. Dewsnup asks the court to award attorney fees and costs under 29 U.S.C. § 1132(g) and 28 U.S.C. § 1920, and 10% pre-judgment interest in accordance with Utah Code § 15-1-1.

29 U.S.C. § 1132(g)(1) states that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." To determine whether to award fees and costs under the provision, the court should consider five non-exclusive factors:

21

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to personally satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

Gordon v. U.S. Steel Corp., 724 F.2d 106, 109 (10th Cir. 1983)

These factors cut both ways. Mr. Dewsnup has prevailed over Unum, and Unum can certainly satisfy an award of fees and costs. But this case does not involve a significant legal question regarding ERISA or apply broadly to all plan participants. Most importantly, the record does not show that Unum acted in bad faith. Unum's decision to terminate benefits was simply not supported by the weight of evidence in the record. For these reasons, the court will not award Mr. Dewsnup attorney fees or costs under 29 U.S.C. § 1132(g)(1), nor will it award costs under 28 U.S.C. § 1920.

As for prejudgment interest, "[a] two-step analysis governs the determination of such an award." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1286 (10th Cir. 2002). "The district court must first determine whether the award of prejudgment interest will serve to compensate the injured party. Second, even if the award of prejudgment interest is compensatory in nature, the district court must still determine whether the equities would preclude the award of prejudgment interest." Id. (internal quotations omitted).

The court will award prejudgment interest at a rate of 5% per annum starting from April 28, 2016, the date Unum terminated benefits, to the date of this Order. The 5% interest rate

compensates Mr. Dewsnup for being denied use of his disability benefits without punishing Unum.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.  The court GRANTS in part and DENIES it in part Mr. Dewsnup's Motion for Summary Judgment (ECF No. 29):

    a.  The court reverses Unum's decision to terminate Mr. Dewsnup's disability benefits;

    b.  Unum must pay Mr. Dewsnup the remainder of his benefits and pre-judgment interest at a rate of 5% per annum; and

    c.  Mr. Dewsnup is not awarded attorney fees or costs.

2.  The court DENIES Unum's Motion for Summary Judgment (ECF No. 34).

3.  FURTHERMORE, Mr. Dewsnup must file a proposed order of judgment that includes the total benefit award amount, calculated in accordance with this Order and the terms of the Plan, on or before December 21, 2018.  Unum may file an objection to the award amount on or before January 4, 2019.

DATED this 10th day of December, 2018.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge